UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

TANK TECH, INC.,                    )
                                    )
            Plaintiff,              )
                                    )
vs.                                 )        Case No. 1:07CV20 HEA
                                    )
LAD NEAL,                           )
                                    )
            Defendant.              )

## OPINIONS, MEMORANDUM AND ORDER

This matter is before this Court on Counts II and III of Plaintiff's Petition for

Temporary Restraining Order, Injunction and Damages. Count I of the Petition has

been granted to the extent that while in the State Court, a temporary injunction was

entered and continued by this Court, with modifications.  Counts II and III of the

Petition seek preliminary and permanent injunctive relief.  The parties agreed to

consolidate in one trial the issues contained in Counts II and III.  The Court

conducted trial on these Counts on May 14, 15, 2007 and June 4, 2007.  Count IV,

which seeks damages for an alleged violation of the Missouri Uniform Trade

Secrets Act, has been reserved for trial at a later date.

## Facts and Background

Plaintiff, Tank Tech, is a Missouri corporation based in Blodgett, Missouri. It is in the business of retrofitting/lining, inspection and repair of above ground and underground storage tanks used in the petroleum industry. David Russell is Plaintiff's owner and President. In the early 1990's Russell's company began doing business as Tank Tech, Inc. Plaintiff conducts its business in several states throughout the United States. In 1999, Plaintiff began utilizing a lining and retrofitting system known as the Phoenix Secondary Containment System.[1] This system consists of an epoxy coating on the interior lining of the tanks, followed by an interstitial material known as Parabeam followed by another coating of epoxy. Parabeam is a cloth-like material that comes in 250-pound rolls. Workers roll Parabeam onto the inside walls of the tank and cover it with resin. This resin causes the cloth to expand and harden, creating a rigid interior wall and an interstitial space as it dries. Workers then spray an epoxy coating on top of this wall to form a thick layer of protection on the inside of the tank. Plaintiff purchases the Parabeam material from ZCL USA and the coating material from Bridgeport Chemical in

---

[1] Installing a double-wall containment system in an existing tank is often referred to as "retrofitting" or "lining" the tank. The containment system at issue in this case has been variously referred to as "double-wall tank lining," the "primary containment system," the "secondary containment system," "PCS" and the "Phoenix System." All of these terms are essentially synonymous, with the Phoenix system being a trade name for the Parabeam double-wall retrofitting process.

Florida.  In early 2004, Plaintiff became the only authorized installer of the Phoenix System in the State of Florida.  Because of this exclusive authorization and the resultant growth in its business, Plaintiff has established an office in Florida.

Petrofuse, Inc. is a European-based corporation that started doing business in the United States in 2006.  In Europe, Petrofuse's business has focused on the set-up of convenience stores and the sale and installation of fuel dispensers and piping.  Its sister corporation, GraphiteUK, has been in the business of lining and retrofitting fuel storage tanks.  In the United States, the company is operating all aspects of its business--fuel dispensers, piping and retrofitting of tanks--under the name "Petrofuse."  Petrofuse creates its interstice with a stiff material called Cordek.  Cordek is manufactured in 4' x 8' sheets, like plywood.  The material resembles corrugated cardboard, but looks and feels like plastic.  It is similar to the material used to make mail crates.  Workers use double-sided tape to attach the Cordek to the inside walls of the tank, then cover the Cordek with layers of fiberglass and epoxy to create the inner wall of protection.

Florida law requires all underground fuel storage tanks to be equipped with double-wall, active-monitoring secondary containment systems before 2010.  Gas stations and convenience stores can comply with this mandate by either retrofitting existing tanks or installing new tanks with secondary containment.

Defendant was first employed by Plaintiff in 1996 as a part-time welder.  In 2001, he went to work full-time for Plaintiff.  Once employed full-time, Defendant began working in the field for Plaintiff performing work in preparation of, and in lining of, retrofitting underground storage tanks, as well as storage tank inspection.  By the middle of 2002, Defendant was promoted to foreman.  His job as construction superintendent required supervising three (3) Tank Tech construction crews.

Frank McLeod was, at one time, in the tank lining business.  He owned a tank lining company in South Carolina known as Sub-Com.  McLeod sold his business and ultimately went to work as a manufacturer's representative for a company known as F&W Components.  On August 18, 2003, F&W Components entered into an exclusive applicator representative agreement with Tank Tech whereby F&W Components would market, sell and arrange for installation of certain products of Tank Tech in the Florida market.  In July, 2006, F&W Components terminated its contract with Tank Tech.  Prior to this termination, F&W Components was in discussions with GraphiteU.K. The discussion centered around forming a company in the United States to install not only Petrofuse piping systems, but the sales and installation of Petrofuse's secondary containment systems.  In late September, 2006, David Russell learned that McLeod and F&W Components' owner, Roger

McKelvey, might be working for a competitor in the State of Florida and might try to solicit Tank Tech employees. Russell contacted Defendant in early October and told him not to talk to McLeod or McKelvey and also to advise all other Tank Tech employees in Florida of the potential solicitation of Tank Tech employees.

McLeod and Defendant met in early October, 2006.they discussed the possibility of Defendant working for Petrofuse. Defendant informed a Tank Tech co-employee, Dave Hammon, that he was going to work for Petrofuse. On December 3, 2006, Defendant emailed Petrofuse manager Chris Nichols that he planned to send in his resignation on December 23, as soon as he got his bonus.

Shortly after Defendant's resignation, Plaintiff discovered that on November 28, 2006, Defendant emailed form his Tank Tech email address to his personal email address numerous photographs of a Tank Tech worksite depicting among other things Tank Tech's eductor system, the equipment layout of Tank Tech's work trailers, photographs of Tank Tech's completed designed square man ways, and photographs of other tools and devices utilized by Tank Tech. These photographs were provided by Defendant to Chris Nichols. On December 3, 2006 Defendant emailed from his Tank Tech email address to his personal email address a preconstruction checklist for a Circle K convenience store job. He also emailed Tank Tech's list of items needed and items used for all Tank Tech job sites.

Defendant was employed by Plaintiff as a construction foreman until December 28, 2006, when he resigned. As a condition of his continuing employment, Defendant executed a Non-Compete Agreement on September 6, 2005, which provides, in pertinent part:

> [Neal agrees] that on termination of employment for any cause whatsoever, [he] will not directly or indirectly engage or accept employment in any competition business that promotes any services that competes with Tank Tech, Inc. . . [Neal] shall not share trade secrets with out [sic] written consent of Tank Tech, Inc. management.

> [Neal also agrees] not to be connected with or employed by any person, firms or corporation engaged in any competition business with Tank Tech, Inc. All terms of this agreement shall be for a period of 5 (five) years from the date his or her employment closes with Tank Tech, Inc. This agreement covers all areas of the continental United States.

> This agreement encompasses all facets pertaining to the operation of tank Tech, Inc. Including working categories of administration, clerical and physical labor.

Defendant began working for Petrofuse in January, 2007 in the State of Florida. On January 4, 2007, Plaintiff filed its Petition in the Missouri State Court, in which it alleged Defendant misappropriated its trade secrets. The matter was removed to this Court based on the Court's diversity of citizenship jurisdiction.

The trade secrets Plaintiff claims to be protected are:

a.    Tank Tech owner David Russell developed a device know as a <u>bottom flatness tool</u> for pre-screening fiberglass storage tanks.

Roughly 50% of the underground storage tanks in the State of Florida are fiberglass. Prior to Tank Tech's development of the bottom flatness tool, it was required that the tank be emptied of petroleum product and entry to the interior of the tank be accessed to determine whether or not the tank was in suitable condition for retrofitting. The prior method of inspection required multiple man hours and was expensive to the customer. The bottom flatness tool that Mr. Russell developed allowed Tank Tech to inspect the tank from the exterior to determine whether the tank was suitable for retrofitting. The utilization of this new device made the inspection process much less costly to the customer due to a great decrease in man hours.

b.     David Russell designed and developed an eductor (venturi) device that is unique to the industry. Although eductors (ventures) are utilized by other tank liners to purge fuel vapors from a storage tank prior to entry, the particular system that Mr. Russell designed and developed provides Tank Tech with two (2) distinct advantages. The first advantage is safety in that he base piece of the eductor has a y piece extending from the base piece which allows quick reading with an LEL meter and probe of the interior fuel vapors of the tank to determine what the level of the fuel vapors are at any given time during the purging process. The methods that other tank liners utilize including Ulrich Industrial Coatings consist of a flexible plastic tube. There is danger of explosion when inserting a fuel vapor probe into the flexible plastic funnel during the purging process. The second innovation is the utilization of a large diameter pipe extension to the eductor horn which decreases the resistance of the air movement thus increasing the rate of vapor evacuation from the tank and therefore saving time and man hours. **Plaintiff's Exhibit R.** Mr. Russell has applied for a patent on this device.

c.     Former job superintendent Tim Russell while employed by Plaintiff designed and developed a <u>roller applicator</u> device that is utilized to the parabeam interstice material as part of the tank

lining process.  Petrofuse also installs a secondary containment system.  Tank Tech employee Tim Russell is familiar with the secondary containment system that Petrofuse installs.  Although the interstice material of the Petrofuse system cannot be applied with the roller applicator, three (3) layers of cloth that are applied on top of the Petrofuse interstice material can be applied with a roller applicator.  At the present time Petrofuse hand lays the three layers of cloth.  The fiberglass applicator roller saves approximately eight (8) to ten (10) man hours of work per day saving Tank Tech on man hour overhead costs which in turn makes Tank Tech more profitable and competitive.

d.      Dave Russell designed and developed a secondary containment monitoring system which is presently in the patent application process with the U.S. Patent Office.  The original monitoring housing used with the Phoenix Secondary Containment System is prone to failure due to stress from the movement of the tank.  The secondary containment system including all secondary containment systems either installed or that will be installed in the Florida market require a monitoring system to monitor the interstice material.  If the monitoring system shows that the interstice material contains water then that indicates a leak coming form the exterior of the tank.  On the other hand if the reading of the interstice material indicates a gasoline reading, then there is a leak occurring from within the interior of the tank.  Tank Tech's monitoring system will also work well with Petrofuse's secondary containment system.

e.      Tank Tech designed and developed a quick connect grounding system.  In the tank lining business prior to any work on a gasoline storage tank the tank and nearby equipment have to be properly grounded in order to prevent static electricity, which can cause an explosion.  Prior to Tank Tech's development of the quick connect grounding system, the grounding process was slower and in some cases could not be reliable in terms of safety.  Competitors use alligator clips which are unreliable because they can become disconnected easily.  The quick connect grounding

system provide Tank Tech with two (2) advantages, one, safety and two, time savings.

Tank Tech's quick connect system has one grounding line which has male connections on the grounding cable along its length and those connections are simply plugged into female connections on the various pieces of equipment required to be grounded. The second advantage is speed and efficiency. Two (2) to three (3) man hours are saved which contributes towards making Tank Tech jobs more profitable because of the savings of man hour overhead costs.

f.     Tank Tech has developed a <u>unique modification to</u> what is known as a <u>rock vac system</u>. Rock vac systems are available commercially but come with a 20 gallon hopper. In the tank lining industry rock vac systems are utilized to suck sandblasting residue and other residue from inside a storage tank prior to lining the tank. The problem with the 20 gallon hopper on a commercially available rock vac system is that the hopper fills up quickly and once it fills up the engine shuts down, thereby requiring the operator to empty the hopper before restarting the engine to complete the job. Tank Tech construction supervisor Tim Russell developed an attachment whereby the sandblast residue goes into 55 gallon drums which are sealed for disposal. When a 55 gallon drum is full the attachment is moved to another 55 gallon drum without interruption to the rock vac task. This saves Tank Tech man hours and man hour overhead contributing to making an overall tank retrofitting job more quick and efficient. This gives Tank Tech the advantage of being more profitable and provides the customer an advantage of shortening the work at the tank retrofit job site thereby saving the customer on business interruption.

g.     Frequently tanks that are emptied of its contents will have small hole [sic]. Pressure from water surrounding the hole causes water to leak into the tank. Therefore repair of the hole has to

be accomplished before the tank can be lined. Tank Tech has developed a <u>unique method for repairing</u> holes in underground storage tanks. The conventional method used by competitors is to patch the hole with a magnesium coated boiler plug which eventually corrodes and fails. Tank Tech developed a method of patching holes utilizing a square patch of butyl rubber and placing it under a square piece of steel, and welding the patch with the steel plate over the hole. This technique is quicker and more reliable because it does not corrode.

**Plaintiff's proposed Findings of Fact and Conclusions of Law and Judgment, p. 5-7.**

Plaintiff also claims trade secrets in the following devices, designs and techniques: its method of sandblasting tanks; its modifications to a commercially available 56 Graco pump, whereby the pump line spray operator performs a continuous operation without interruption; and square manway covers that Plaintiff has designed and fabricates.[2]

## <u>Discussion</u>

Plaintiff seeks to enforce the Non-Compete Agreement and enjoin Defendant from working for Petrofuse or any other tank liner/retrofitter competitor of Plaintiff

---

[2] Plaintiff presented evidence with respect to other aspects and procedures of its business throughout the course of the trial. Plaintiff has, apparently, abandoned its claim of trade secrets with respect to those items not designated as "trade secrets" in its delineation of such in its Proposed Findings of Fact and Conclusions of Law. To the extent that Plaintiff has not abandoned these designs, methods and techniques, the Court's discussion herein applies equally to them.

in any aspects of the tank lining/retrofitting business in the Continental United States for a period of five (5) years form the date Defendant signed his contract of employment with Petrofuse.

The Court recognizes that while employed with Plaintiff, Defendant had a duty of loyalty to Plaintiff. Under *Nat'l Rejectors, Inc. v. Trieman,* 409 S.W.2d 1, 41 (Mo. banc 1966), every employee owes his or her employer a duty of loyalty. *Trieman,* 409 S.W.2d at 41; *see also* Rest. (2d) Agency, sec. 387 (1958). The Missouri Supreme Court has described the duty of loyalty in the broad and general terms of section 387 of the Restatement (2d) of Agency, stating, "[an employee] must not, while employed, act contrary to the employer's interests." *Trieman,* 409 S.W.2d at 41; *Scanwell Freight Express STL, Inc. v. Chan,* 162 S.W.3d 477, 479 (Mo. 2005). See also, *Synergetics, Inc. v. Hurst,* 477 F.3d 949, 959 (8th Cir. 2007)("A breach of the duty of loyalty 'arises when the employee goes beyond the mere planning and preparation and actually engages in direct competition, which, by definition, is to gain advantage over a competitor.' *Scanwell Freight Express STL, Inc. v. Chan,* 162 S.W.3d 477, 479 (Mo.2005) (en banc). Although permitted to make arrangements to compete with an employer prior to termination of employment, an employee may not use confidential information peculiar to or acquired from his employer, nor may the employee solicit customers for his rival

company. *See id.* at 481 *(citing* Restatement (Second) of Agency, § 393 cmt. e (1958))."). Plaintiff, however, seeks to enjoin Defendant from post-employment competition through its non-compete agreement and recovery of resultant damages for misappropriation of its trade secrets under the Missouri Uniform Trade Secrets Act.[3]

The Missouri Supreme Court[4] has identified the concerns at issue in analyzing non-compete agreements:

> There are at least four valid and conflicting concerns at issue in the law of non-compete agreements. First, the employer needs to be able to engage a highly trained workforce to be competitive and profitable, without fear that the employee will use the employer's business secrets against it or steal the employer's customers after leaving employment. *See West Group Broadcasting, Ltd. v. Bell,* 942 S.W.2d 934, 937 (Mo.App.1997). Second, the employee must be mobile in order to provide for his or her family and to advance his or her career in an ever-changing marketplace. This mobility is dependent upon the ability of the employee to take his or her increasing skills and put them to work from one employer to the next. *See id.* Third, the law favors the freedom of parties to value their respective interests in negotiated contracts. *Willman v. Beheler,* 499 S.W.2d 770, 777 (Mo.1973). And fourth, contracts in restraint of trade are unlawful. *See* section 416.031.

---

[3] Plaintiff's Petition does not include a claim for the common law action of breach of the duty of loyalty.

[4] The Court applies the law of the State of Missouri in this diversity of citizenship case. See, *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938).

*Healthcare Services of the Ozarks, Inc. v. Copeland,* 198 S.W.3d 604, 609-610

(Mo. 2006)(footnotes omitted).  See also *Emerson Elec. Co. v. Rogers* 418 F.3d

841, 844-45 (8th Cir. 2005)("In Missouri there are two primary considerations

governing the enforceability of covenants not to compete: the parties' agreement

must protect well recognized employer interests, and the terms must be reasonable

in geographic and temporal scope.  *Furniture Mfr. Corp. v. Joseph,* 900 S.W.2d

642, 647 (Mo.Ct.App.1995).  [Plaintiff] argues that its covenant not to compete is

necessary to protect its trade secrets and its customer contacts, both of which have

been recognized as legitimate employer interests in Missouri.  *See Armstrong v.*

*Cape Girardeau Physicians Assoc.,* 49 S.W.3d 821, 825 (Mo.Ct.App.2001).")

Bearing the conflicting interests in mind, Missouri courts balance the

concerns by enforcing non-compete agreements in certain limited circumstances.

Non-compete agreements are enforceable to the extent they can be narrowly tailored

as to geographical location and length of time the restriction is in effect.  In addition,

such restrictions are not enforceable to protect an employer from mere competition

by a former employee, but only to the extent that the restrictions protect the

employer's trade secrets or customer contacts.  *Id.*

Under the Missouri Uniform Trade Secrets Act, a "trade secret" consists of:

information, including but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, or process that:

> (a) Derives independent economic value, actual or potential, form not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value form its disclosure or use; and

> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mo.Rev.Stat. § 417.453 (2000).  See also, *Lyn-Flex West, Inc. v. Dieckhaus,* 24 S.W.3d 693, 697-698 (Mo.App.1999)(A "trade secret," according to Missouri law, is information-including but not limited to-technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, or process that derives independent economic value, actual or potential, from  not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use).  Furthermore, in order to be considered a trade secret, the information must be the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  *Conseco Finance Servicing Corp. v. North American Mortgage Co.* 381 F.3d 811, 818-819 (8th Cir. 2004).

The following factors should be considered in determining whether an employer's given information is a trade secret:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Continental Research Corp. v. Scholz,* 595 S.W.2d 396, 400-01 (Mo.App.1980) (*citing National Rejectors Inc. v. Trieman,* 409 S.W.2d 1, 18-9 (Mo. banc 1966)).

*Copeland,* 198 S.W.3d at 610.

The employer bears the burden of proof to substantiate its asserted interest in its trade secrets. *Mo-Kan Central Recovery Co. v. Hedenkamp,* 671 S.W.2d 396, 400 (Mo.App.1984). Evidence of purported "trade secrets" must be more than general assertions, but must be sufficiently specific to allow a determination by the court. *Copeland,* 198 S.W.3d at 610. See also, *Baxter,* 976 F.2d at 1194. ("The burden of proving the existence of trade secrets lies with the party seeking protection.").

Additionally, "[u]nder Missouri law, the restraint imposed on a former employee to protect trade secrets must not be greater than required for the protection of the former employer." *Baxter,* 976 F.2d at 1194. While a former

- 15 -

employer is not required to await actual harm before seeking relief, injunctive relief "must be based on a real apprehension that future acts are not just threatened but in all probability will be committed." *Id.*

Plaintiff's cause of action is fatally and inescapably doomed by its own lack of secrecy with respect to all of the designs and developments it has presented. When questioned about the actions taken by Plaintiff to maintain the secrecy of any claimed trade secrets, Plaintiff's owner/president testified that he established "integrity" with his employees, the employees barricaded job sites to keep people from entering the work areas, and he had his employees sign non-compete agreements. These actions alone are insufficient to satisfy the factors outlined by the Missouri Supreme Court in determining whether Plaintiff has met its burden of proof. The extent to which the information is known outside of Plaintiff's business, the extent to which the information is known by employees and others involved in Plaintiff's business, and the extent of measures taken by Plaintiff to guard the secrecy of the information establish that the claimed "trade secrets" were not secret in any way. Plaintiff's employees all knew of the devices, methods and techniques. None were ever told that any of the information was to be considered a "trade secret" and should not to be disclosed. Plaintiff's reliance on the non-compete agreement to establish secrecy likewise fails. In order for a non-compete agreement

to preclude disclosure of trade secrets, those secrets must exist; they do not exist by virtue of the agreement itself.  Furthermore, Plaintiff promoted its devices and information during its PowerPoint presentations and revealed its devices to the public in this regard and specifically to others in the industry.  Essentially no internal measures were taken to ensure the secrecy of any of the devices, methods and/or techniques.  Specifically, regarding the Bottom Flatness Tool, Plaintiff sold one of the tools to a competitor, thus it can hardly be said that the tool was a guarded company secret.  Likewise, the modification to the Venturi Eductor System was seen and demonstrated by Plaintiff in its PowerPoint trade show presentations.  Furthermore, the use of the system could be openly seen from Plaintiff's job sites.  This is significant, particularly in light of the fact that others in the industry use the Venturi system and Plaintiff's modification is to that existing device; it is easily ascertainable when used on an existing tool.  Plaintiff's square manways and covers were also open and obvious both at the job sites and in Plaintiff's presentations.  The grounding system is in plain view on a job site and it is not so complicated that its design cannot be readily reproduced if desired by a competitor.

The other considerations for the Court further establish that the claimed trade secrets cannot withstand analysis.  No evidence was presented that Plaintiff expended a significant amount of effort and/or money in developing the devices,

methods and techniques. Interestingly, most of the designs, methods or techniques are merely what Plaintiff considers improvements to already existing devices. While a layer of originality clearly can establish a new trade secret, Plaintiff's improvements did not require any significant effort or money. For example, the rock vac system simply added a 55 gallon tank as opposed to the original 20 gallon tank. This simple addition neither cost Plaintiff a great amount of time nor required much effort to accomplish. Furthermore, as Defendant points out, this device cannot be assessed as have a great amount of importance to Plaintiff in that the tanks are now already sandblasted and cleared out before Plaintiff begins its retrofitting process. Nor was any evidence presented that the 55 gallon tank would be of significant value to Plaintiff's competitors.

While the roller applicator is clearly a significant tool for Plaintiff, because Plaintiff holds the exclusive right to use the Phoenix system in Florida, the device is of no use to Plaintiff's competitors. They do not have a need for this type of tool in their processes. Plaintiff's attempts to establish a use through speculation that Petrofuse *could* use the tool for some other application does not satisfy the element of importance to Petrofuse.

The value to Plaintiff's competitors of the modification to the Graco pump is clearly nonexistent because this type of pump is commercially available. Thus, this modification can be and is readily available to Plaintiff's competitors. Similarly, as testified to, the method of sandblasting describe as a unique trade secret was never even disclosed to Plaintiff's employees and is considered by Defendant to be of no use whatsoever. Clearly little or no effort was expended with respect to this claimed secret, and as Defendant testified, the manner in which sandblasting is done is whatever gets the job accomplished.

In the same vein, Plaintiff failed to produce evidence that its manner of repairing holes in the tank was a guarded secret, it did not require substantial expenditures of time or money to develop, and there was no showing through the evidence presented that this method would be of significant value to Plaintiff's competitors.

David Russell has filed a patent application for Plaintiff's Monitoring housing system. As such, the system is no longer considered under the law of trade secrets, rather any protection against infringement is provided through patent laws and is not the subject of this litigation. *On-Line Tech. V. Bodenseewerk Perkin-Elmer*, 386 F.3d 1133, 1141 (Fed. Cir. 2004)("After a patent has issued, the information

contained within it is ordinarily regarded as public and not subject to protection as a trade secret. *See Restatement (Third) of Unfair Competition* § 39 cmt. f (1995) ( "Information that is generally known or readily ascertainable through proper means ... by others to whom it has potential economic value is not protectable as a trade secret. Thus, information that is disclosed in a patent or contained in published materials reasonably accessible to competitors does not qualify for protection [as a trade secret]."); *Conmar Prods. Corp. v. Universal Slide Fastener Co.,* 172 F.2d 150, 155-56 (2d Cir.1949) (L. Hand)" ).

## Conclusion

The evidence presented throughout the course of the hearing on Plaintiff's motion for preliminary and permanent injunction fails to satisfy the elements necessary to establish that Plaintiff has protectable trade secrets. As such, under Missouri law as discussed herein, injunctive relief is not available to bar Defendant from engaging in competition with Plaintiff.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Petition for Preliminary and Permanent Injunction is denied.

**IT IS FURTHER ORDERED** that Defendant's request for attorney's fees

as damages on the injunction bond is denied.

Dated this 23rd day of July, 2007.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE